# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL NO. 3:05CV262-H

| | |
|---|---|
| **BRITANINNIA CLIFTON,** ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **MEMORANDUM AND ORDER** |
| ) | |
| **JO ANNE B. BARNHART,** ) | |
| **Commissioner of Social** ) | |
| **Security Administration,** ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on the "Plaintiff's Motion for Summary Judgment" (document #14) and "Brief Supporting ..." (document #15), both filed July 20, 2006; and Defendant's "Motion For Summary Judgment" (document #16) and "Memorandum in Support of the Commissioner's Decision" (document #17), both filed August 14, 2006. The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned finds that the Defendant's decision to deny Plaintiff Social Security disability benefits is supported by substantial evidence. Accordingly, the undersigned will <u>deny</u> Plaintiff's Motion for Summary Judgment; <u>grant</u> Defendant's Motion for Summary Judgment; and <u>affirm</u> the Commissioner's decision.

## I. PROCEDURAL HISTORY

On January 25, 2002, the Plaintiff filed an application for a period of disability, Social Security Disability benefits ("DIB"), and Supplemental Security Income benefits ("SSI"), alleging

she was unable to work as of September 9, 2000 due to asthma, bronchitis, tumors, tendinitis, and her "mental health." (Tr. 103). The Plaintiff's claim was denied initially and on reconsideration.

The Plaintiff requested a hearing, which was held on April 26, 2004. On May 25, 2004, the ALJ issued a decision denying the Plaintiff's claim, concluding that the Plaintiff retained the residual functional capacity ("RFC") for light work allowing a sit/stand option, requiring no climbing, working at heights or around dangerous equipment, or exposure to respiratory irritants, and that was performed in a low stress environment involving simple, routine, repetitive tasks; and that with this RFC, there were a significant number of jobs that the Plaintiff could perform in the national economy.

The Plaintiff subsequently filed a timely Request for Review of Hearing Decision. On April 18, 2005, the Appeals Council denied the Plaintiff's request for review, making the hearing decision the final decision of the Commissioner.

The Plaintiff filed this action on June 9, 2005, raising only a single issue on appeal: whether the ALJ erred in concluding that the opinions of her treating mental health providers, Bo Brown, M.D., and Luther Jennings, M.D., or at least the portions of those opinions, discussed below, which the Plaintiff considers to be favorable, were not entitled to controlling weight.

The parties' cross-motions for summary judgment are now ripe for the Court's consideration.

## II. FACTUAL BACKGROUND AND FINDINGS

Relevant to the narrow issue presented on appeal, at the time of the hearing, the Plaintiff was 42 years-old, had completed high school and taken some college-level computer courses, and had

past relevant work experience in a variety of restaurant and fast food jobs.[1] The Plaintiff testified that she was able to perform a wide range of household chores; that she read five hours and watched television four hours each day; that she used public transportation; and that once or twice each week, she participated in her church's "One-Call Ministry" through which she served as a volunteer care giver in the home of a paraplegic man. Each shift of care giving began at 8:00 a.m. and ended no earlier than midnight, during which time the Plaintiff prepared her patient's meals, performed other household chores, and read to him.

The VE characterized the Plaintiff's former restaurant and fast food work as light to medium, unskilled to skilled.

The ALJ presented the VE with the following hypothetical:

> a claimant with the same age, education and work background as [the Plaintiff capable of performing] jobs at the light exertional level that would accommodate the following: no climbing, work that would be in a low stress work environment with only simple, routine, repetitive tasks ... minimal exposure to dust and chemicals and other environmental irritants, no work around heights or dangerous equipment, and work that would accommodate the need for a sit/stand option. Are there any jobs at the light exertional level [such a person could do]?

(Tr. 77).

The VE testified that with these restrictions, the Plaintiff could work as a home companion, a parking lot attendant, and a checkroom attendant; and that 10,157 of these jobs were available in North Carolina.

As noted, the Plaintiff has adopted the ALJ's recitation of the facts, including of the Plaintiff's medical and mental health records. Moreover, the undersigned has carefully reviewed

---

[1] Although this factual recitation is limited to those facts relating to the single issue raised on appeal, the undersigned notes that the Plaintiff has stipulated to the ALJ's statement of the facts (Tr. 16-22) in its entirety. See document #15 at 2-3.

those records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical and mental health records, as follows:

> The medical evidence shows that in November 2001 the claimant presented for an annual examination and reported an approximate eight month period of heavy bleeding and clotting, and was also found to have microcytic anemia. An ultrasound was performed and revealed multiple uterine fibroid that necessitated surgical intervention with a hysterectomy, which was performed in August 2002, Thereafter, her anemia was much improved (Exhibits 3F, 5F, 8F, and 9F).
>
> The claimant was not treated for knee pain until March 2004. At that time, she complained of bilateral knee pain, lower back and right shoulder pain, difficulty moving her right arm above her head, and pain with any motion. She reported that those symptoms that had been present since approximately November 2003, had not gotten any better and were worse with climbing stairs. She also reported that she had bilateral knee pain for several years and was treated with multiple steroid injections many years ago. The claimant reported that she previously weighed 380 pounds but that her weight was down to roughly 240 pounds. Examination revealed significantly decreased range of motion involving the claimant's right upper extremity. Rotator cuff strength testing was difficult to perform due to pain, but it appeared that she had normal rotator cuff strength. Examination of her lower back revealed point tenderness over the mid point of her back. She had negative straight leg raising and full range of motion of her knees and hips. Examination of her knees revealed bilateral medial joint line tenderness but she had no meniscal irritation signs and no signs of effusion. She was assessed with adhesive capsulitis of the right upper extremity, bilateral knee degenerative joint disease, and mechanical low back pain. She was treated with non-steroidal medications and would be considered a candidate for subacromial injection if her symptoms persisted (Exhibit 9F). The medical evidence shows mention of the claimant's diabetes; however it has been consistently described as "diet controlled diabetes"....
>
> The medical evidence shows the claimant has a history of substance abuse and depression manifested by mood swings, episodes of anger and frustration particularly in social situations, auditory hallucinations, and that she has been treated with multiple medications, including Depakote, Prozac, and Risperdal, intervention from a mental health facility, and a previous psychiatric hospitalization. Attending clinical psychiatrist Dr. Bo Brown concluded in July 2003 that, due to mood swings, insomnia, and irritability, the claimant was unable to maintain stability or reliability, and that she was prone to violent temper outbursts and that she had an obsessive preoccupied with germs. He also concluded that the claimant had a very poor ability to relate to others due to extreme irritability, poor impulse control, and low frustration tolerance. While I have not ignored Dr. Brown's medical assessment, I find that, for the reasons explained more fully below, his conclusion is inconsistent with his own treatment

4

notes and inconsistent with other medical evidence of record.

Dr. Brown began treating the claimant in December 2002 when she relocated to the Charlotte area. At that time, the claimant reported that she had been out of medication and had not taken any medication since the previous week. She reported an inability to sleep and that the previous week she had a "violent episode" when she became angry with a relative with whom she physically fought with, kicked out of the house and to be restrained by other family members. She also reported a two month period of decreased concentration, increased forgetfulness, and increased crying spells. She also reported that she had been clean and sober since 1999. On mental status examination, the claimant had good attention and concentration, she was alert and oriented, well groomed and demonstrated good eye contact. She was cooperative, her speech was of normal rate and tone, her mood was "ok," and her affect was appropriate to mood. She denied suicidal or homicidal ideations, but reported auditory hallucinations of female voices telling to do mischievous things. Dr. Brown assessed the claimant with bipolar affective disorder by history, and assessed her poly substance abuse as in remission. Her Global Assessment of Functioning (GAF) was assessed as 53, indicating that her symptoms were moderate. As a result, the claimant's medications, including Depakote, were restarted.

The claimant failed to keep her appointment with Dr. Brown on January 3, 2003. When she was seen on February 2003, she reported that her symptoms were fairly stable. She denied any auditory or visual hallucinations and reported that she continued to be clean and sober. She reported that she had insomnia and headaches and flares of violent temper outburst. Dr. Brown advised the claimant to continue with her counseling sessions. In March 2003 Dr. Brown advised the claimant of the potential consequences of physical violence, after she reported that she lost her temper in a Wal Mart store and became loud and aggressive but that she did not assault anyone. In April 2003 Dr. Brown adjusted the claimant's dosage of Prozac to twice weekly since she could not afford daily dosages (Exhibit 1 OF).

On April 26, 2002, Nona Patterson, Ph.D., conducted a mental status examination. When the claimant's daily activities were addressed, she said that she spent most of her time at One Call Ministries, indicating she was there from 8:00 am until midnight. She said that she was able to wash dishes, cook for herself, and that she liked to read, draw, sew swim, and shoot pool. She was not attending AA or NA meetings due to lack of transportation; but she also said that was able to take the bus system. Dr. Patterson found the claimant functioning in the average range of intellectual functioning and was aware of her problems, but that she had not followed through with treatment in a consistent manner. Dr. Patterson's diagnostic impression included mood disorder and personality disorder, not otherwise specified and history of poly substance dependence in remission. Dr. Patterson noted a number of inconsistencies, such as, while the claimant reported difficulty leaving her bedroom and her house, she also reported that she spent many hours at One Call Ministries. Further, the claimant

reported that she had been taking her medications since January 2002, even though she had not returned to the mental health facility or had her prescriptions refilled at a pharmacy. Dr. Patterson concluded that the claimant was capable of performing simple, routine repetitive tasks. In addition, the claimant reported that she had gotten along with co-workers and supervisors and only had problems being around two or more people. However, Dr. Patterson noted again that the claimant spent much of her day at a church program, that she has a history of working in restaurants, and has spent a good part of the last few years incarcerated and, thus, had learned to tolerate being with others. In addition, during the examination, the claimant did not have problems with concentration persistence, or pace (Exhibit 2F).

Dr. Brown noted on May 19, 2003, when the claimant returned, that she showed improvement even though she continued to have symptoms including social isolation, feelings of irritability and not wanting to answer the telephone. At that time, the claimant denied suicidal ideation, and reportedly had only one episode where she challenged a girlfriend of a relative to a fight. Dr. Brown continued the claimant on the same medications and increased the dosage of Zoloft. When the claimant returned for a follow-up examination on July 18, 2003 Dr. Brown started her on Seroquel in an effort to decrease her insomnia and to assist with her mood instability, and also started her on samples of Zoloft. He prescribed these medications after the claimant complained of fatigue, an inability to sleep, feeling frequently overwhelmed, and an obsession with germs in that she could not tolerate germs and sprayed most of the surfaces in her house with bleach that she sometimes added bleach to her bath water. The claimant also reported at that time that she had been "getting real angry lately." She said that prior to the breakup with her boyfriend, with whom she lived with and his mother, she attempted to "cut his balls off with a knife," and that his mother came after her with a sledge hammer, so she eventually left the house. She further reported an episode when she attempted to hip [sic] her teenage daughter with a frying pan. She said that even though she knew the consequences of such behavior, she "just don't' care what happens to me sometimes." The claimant denied suicidal or homicidal ideations. Dr. Brown noted that even though the claimant understood the consequences of her violence, she seemed to think it was some how humorous, after she described the attempts to assault to others with a slight smile on her face. The claimant did not show for her appointment scheduled for August 1, 2003. When she presented later that month, she reported improvement in her ability to sleep, and reported that she learned how to avoid certain people who were likely to set her off. She also reported that the relationship with her boyfriend had permanently ended and said that was a positive thing for her. She denied suicidal ideation, there was no evidence of psychosis, and Dr. Brown described her condition as improved and advised her to continue with the same medications. The claimant failed to keep her October 10, 2003 appointment with Dr. Brown, and on January 9, 2004 he discharged the claimant from his care, indicating that the "client dropped out," and did not make note of the results of his service, indicating that he had not seen the claimant since August 15, 2003 (Exhibits 3F, 10F, and 15F).

> In a note dated April 7, 2004 Mr. Michael Brown, a clinical counselor at the Southeast Addiction Institute and Learning Center, indicated that the claimant was enrolled in intensive outpatient treatment. He also indicated that the program was qualified to address issues relative to the claimant's possible disability status and/or determination (Exhibit 13F).
>
> The undersigned has also not ignored the Dr. Luther Jennings medical assessment regarding the claimant's mental impairment. His treatment of the claimant began in December 2003, which included Wellbutrin, Depakote, Risperdal, and group therapy sessions to address her coping skills. On April 14, 2004, four months after he began treating the claimant, Dr. Jennings concluded that the claimant's mental status imposed marked limitations of function in areas of sustained concentration and persistence, social interaction, and adaptation, which result in the claimant being unable to complete a workday more than three or four times per month.

(Tr. 18-21).

Considering this and the other undisputed evidence of record, the ALJ concluded that the Plaintiff was not disabled. It is from this decision that the Plaintiff appeals.

## III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v.

Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## IV. DISCUSSION OF CLAIM

The question before the ALJ was whether at any time the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[2] The ALJ considered the above-recited

---

[2] Under the Social Security Act, 42 U.S.C. § 301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

8

evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity at any time relevant to the decision; that the Plaintiff's hypertension, diabetes, bipolar disorder, personality disorder, and history of substance abuse were severe impairments; but that Plaintiff's impairments or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that the Plaintiff was unable to perform her past relevant work; that the Plaintiff retained the residual functional capacity ("RFC") to perform light work with the nonexertional restrictions of work allowing a sit/stand option, requiring no climbing, working at heights or around dangerous equipment, or exposure to respiratory irritants, and that was performed in a low stress environment involving simple, routine, repetitive tasks.

The ALJ then correctly shifted the burden to the Secretary to show the existence of other jobs in the national economy which the Plaintiff could perform. The VE's testimony, stated above and based on a hypothetical that factored in the limitations discussed above, provided substantial evidence that there were a significant number of jobs in the national economy that the Plaintiff could perform, and, therefore, that the Plaintiff was <u>not</u> disabled.

As previously discussed, the Plaintiff does not contest the ALJ's findings related to her physical condition, but contends only that the ALJ erred when he did not extend controlling weight to the opinions of her treating mental health providers, Dr. Brown and Dr. Jennings. <u>See</u> "Plaintiff's Motion for Summary Judgment" (document #14) and "Brief Supporting" (document #15). The undersigned concludes, however, that the ALJ's decision to afford less than controlling weight to the restrictions that Dr. Brown and Dr. Jennings placed on the Plaintiff's mental residual functional capacity was supported by substantial evidence, as were the mental limitations (work in a low stress

environment involving only simple, routine, repetitive tasks) that the ALJ did incorporate into the Plaintiff's RFC.

The Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

Although Dr. Brown opined on July 18, 2003 that the Plaintiff had no ability to relate predictably in social situations and a poor ability to relate to co-workers, deal with the public and work stress, maintain attention and concentration, behave in an emotionally stable manner, and demonstrate reliability (restrictions that the Plaintiff essentially contends would mandate a finding of disability), at the same time, he noted that the Plaintiff had a good ability to understand, remember and carry out both simple and complex, detailed instructions and a fair ability to follow work rules, use judgment, interact with her supervisors and function independently, which would support the ALJ's ultimate conclusion that the Plaintiff was not disabled.

Morever, Dr. Brown's objective findings did not support the restrictions he placed on the Plaintiff's mental RFC. On December 13, 2002, Dr. Brown found that Plaintiff was alert and oriented and she denied suicidal and homicidal ideation, and observed that Plaintiff's speech was

normal, her mood was normal, her affect was appropriate, her thought process was linear and goal-directed, and her attention and concentration were good.

Two months later, Plaintiff reported that her condition was fairly stable even though she had run out of medication.

On May 19, 2003, Dr. Brown determined that while Plaintiff still had some symptoms, she was showing improvement. Further, at Plaintiff's last appointment, on August 15, 2003, she stated that her anger and irritability were generally under control and she was not experiencing any suicidal ideation. Dr. Brown concluded that Plaintiff was not exhibiting any evidence of psychosis and her condition was improved. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965).

The other evidence in the medical record also fails to support the severe restrictions Dr. Brown placed on Plaintiff's mental residual functional capacity. On March 6, 2002, Dr. McLeod observed that Plaintiff's bipolar disorder was stable and her neurological and psychiatric examinations were normal. Dr. Barker found on August 30, 2002 that Plaintiff's mood and orientation were normal. Dr. Porter determined on March 26, 2004 that Plaintiff was alert and oriented to three spheres and she was able to interact appropriately during the examination.

In addition, at her consultative examination with Dr. Patterson, the Plaintiff reported that she could "get along" with her co-workers and supervisors and presently spent the day at a church program. Dr. Patterson also observed that Plaintiff was alert, her thought process was coherent, she

was oriented to four spheres and she was able to follow simple instructions and recall five digits backward and forward. The doctor further found that Plaintiff's recent memory was "okay," her intellectual functioning was in the average range, and that she had no problems with concentration.

Similarly, although Dr. Jennings opined on April 14, 2004 that the Plaintiff was markedly limited in her ability to maintain attention and concentration, interact with the general public, accept instructions, get along with co-workers, and respond appropriately to change; and that she would would miss more than three to four days of work each month due to these restrictions, he also found that the Plaintiff had only mild or moderate, nondisabling limitations in her ability to remember work-like procedures, to understand, remember and carry out simple and complex instructions, to ask simple questions and maintain socially appropriate behavior, to perform activities within a schedule, to sustain ordinary routines, and to complete a normal work week.

As with Dr. Brown's opinion, discussed above, Dr. Jennings' objective findings did not support the restrictions he placed on the Plaintiff's mental RFC. In January 2004, Dr. Jennings found that Plaintiff was oriented to three spheres, that her affect was appropriate, and that she denied any suicidal ideation. At Plaintiff's next three appointments, the doctor noted that she was oriented to three spheres and denied any suicidal or homicidal ideation. Dr. Jennings also reported on March 10, 2004 that Plaintiff was oriented to three spheres, that she denied psychosis and suicidal/homicidal ideation, and that she reported having handled a confrontation on a city bus appropriately.

Moreover, Dr. Jennings' opinion was inconsistent with the Plaintiff's testimony, given 12 days later at the hearing, that she then volunteered as an in-home care giver once or twice each week, from eight in the morning until midnight, where she prepared meals and read to a paraplegic

acquaintance; that she read five hours and watched television four hours each day; and that she was able to care for her personal needs and perform a wide range of housework. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work," which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

In short, there was substantial evidence to support the ALJ's conclusion that the opinions of her treating psychiatrists were not entitled to controlling weight. Accordingly, and where it is otherwise undisputed that a person with the Plaintiff's physical residual functional capacity, age, education, and work experience could perform a substantial number of jobs in the national economy, the ALJ's ultimate decision to deny the Plaintiff Social Security disability benefits must and will be affirmed.

## V. ORDER

**NOW, THEREFORE, IT IS ORDERED:**

1. "Plaintiff's Motion For Summary Judgment" (document #14) is **DENIED**; Defendant's "Motion for Summary Judgment" (document #16) is **GRANTED**; and the Commissioner's decision is **AFFIRMED.**

2. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED AND DECREED**.

Signed: August 21, 2006

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge